LEE *v.* PATTERSON.

4-7201                          176 S. W. 2d 917

Opinion delivered January 17, 1944.

*Claude Duty,* for appellant.

GRIFFIN SMITH, Chief Justice. J. E. Lee's complaint alleged he was not mentally competent to understand the effect of what was being done when, in September, 1941, his wife procured a decree of divorce and the Chancellor approved a property settlement that, *prima facie,* had been voluntarily made. Therefore, he asserts, equity should give relief. He also asked that he be granted a divorce. From an adverse decree the former husband has appealed.

After remaining a widower from February, 1936, until January, 1940, appellant married Mrs. Ida Patterson, with whom he lived until May 24, 1941. He asserts that Ida abandoned him without cause, and before filing suit for divorce threatened to do so and disturbed him mentally by saying she would take a third of his property. She proposed to settle for $6,000 in cash, a farm, and $35 per month, provided appellant would pay her lawyer's fee. The distraught husband admits that he talked with two lawyers, a son-in-law, and several friends, who gave conflicting advice. The court-approved settlement provided that appellee's attorney should be paid $250, that she should receive $350 in cash, $30 per month, and approximately 15 acres, the value of which is not shown.

Jeff Rice, who at one time represented appellant, but who does not appear here, testified that appellant employed him and Vol Lindsey. Rice thought a reasonable settlement would be preferable to a lawsuit. Lindsey did not think appellee's suit was meritorious and so advised appellant. The negotiated settlement, according to Rice, was for approximately half the amount appellee demanded. On cross examination Rice testified that appellant declined to consider the first proposition, but with reluctance agreed to the reduced amount, and understood a divorce was pending:—"I explained it to him the best I could after 25 years of practice. I not only told him, I read the law."

Lindsey testified that appellant was disturbed; that he appeared to be a man who really wanted to live with

his wife. But, he added, "We discussed every angle of this case with him."

Hugh Webb testified that appellant, prior to the divorce, but subsequent to the time appellee's act of abandonment is alleged to have occurred, called frequently at his place and on one occasion said, "Something has got to be done or something is going to happen." Appellant appeared to be worried. He was highly nervous and often remarked that he had not slept any during the previous night. On cross examination Webb conceded that appellant "might have understood what he was doing."

Clint Lee, (appellant's son) who lived with his father and step-mother, testified that the couple did not engage in quarreling, and there was no "nagging." He then added, "I think it almost gave father a nervous breakdown. He couldn't sleep, wouldn't eat, and you couldn't tell much about him." On cross examination the witness said, "I guess father knew what they were trying to do. He did not ask me to go with him to Court."

Appellant, in discussing the settlement, testified: "I don't think I understood it." After talking with Attorneys Rice and Lindsey, appellant said he became confused. When a friend named Easley asked if he had a [pre-nuptial] contract with appellee and he replied that he did not, Easley is quoted as having said, "Well, she's got you then." Appellant says this added to his confused state of mind and worry:— ". . . I finally executed the contract of settlement."

Dr. George W. Newman had examined appellant in May of 1942—more than seven months after the settlement was made. It was the physician's opinion that a person in appellant's condition was not capable of dealing with physical or mental problems. This expression appears in the Doctor's testimony: "At the time I first examined Mr. Lee there was some doubt in my mind as

to whether he would have thoroughly understood and appreciated legal advice."[1] Nothing was said by Lee in connection with the examination regarding his marital difficulties.

Dr. Newman, who testified that he did not think appellant was capable of physical or mental effort, modified this view with the statement that he had "some doubt" whether Lee would have *thoroughly* understood and appreciated legal advice. It is quite clear that the Doctor did not regard appellant as incompetent, for he says he advised Lee to refrain from physical and mental activities. There is in this statement the clear implication that Dr. Newman regarded the object of his professional solicitude as one capable of understanding medical advice. In his own testimony appellant said: "I don't think I understood [the settlement"].

Clint Lee thought his father knew what he was trying to do, while Hugh Webb said appellant might have understood what he was doing. The testimony of Jeff Rice is adverse to appellant's contention. He says the original demand for $6,000 and other payments was flatly declined and that ultimate settlement was on the basis of about half the amount appellee originally asked. Both attorneys counselled with their client and neither was impressed with the want of capacity now alleged. Substance of Dr. Newman's testimony is that he thought business problems and incidental worry would adversely affect the patient's health. Notwithstanding the conclusion as to Lee's condition more than seven months before examination, the opinion is based on too many speculative elements to require a holding here that the trial Court erred in finding that appellant was not impaled. On the contrary, acts seem to have been the result of mental processes excited by fundamental laws of self-preservation.

Affirmed.

---

[1] Appellant was found to be suffering from "generalized arteriosclerosis, coronary sclerosis, hypertrophy of the prostate gland, (severe), and presenile dementia on the basis of generalized arteriosclerosis." [Appellant was 64 years of age.]